IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

IVAN BOYD,

                              Plaintiff,

      v.

SGT KUSSMAUL,
OFFICER LATHROP,
TIMOTHY BROMELAND,
JOLINDA WATERMAN,
RN ANDERSON and
RN DRONE,

                              Defendants.

OPINION AND ORDER

18-cv-768-wmc

*Pro se* plaintiff Ivan Boyd is proceeding in this lawsuit on constitutional and state-law claims against six Wisconsin Secure Program Facility ("WSPF") employees for denying the delivery of his prescribed pain medication, then retaliating against him for complaining about it. Pending before the court are defendants' motions for partial summary judgment on exhaustion grounds (dkt. #23), and for summary judgment on the ground that Boyd released all of his claims in a 2019 settlement agreement with the State of Wisconsin (dkt. #32).[1] Because defendants have established that Boyd failed to exhaust his First Amendment retaliation claims against defendants Jolinda Waterman and Logen Lathrop, as well as his Eighth Amendment medical care claim against defendant Ashley Drone, those claims will be dismissed without prejudice. As for Boyd's remaining Eighth Amendment claims, however, the court will deny the defendants' comprehensive motion for summary

---

[1] Boyd filed a motion to strike defendants' summary judgment materials outright because they did not file an initial brief in support with the latter motion itself. (Dkt. #54.) However, because defendants filed their brief in support the same day they filed their proposed findings of fact (*see* dkt. #50), that motion will be denied.

judgment due to ambiguities in the language in and factual disputes about the scope of the 2019 settlement agreement.  The court will set this case for a hearing to resolve defendants' release affirmative defense.

FACTS

Boyd filed this lawsuit on September 17, 2018, but the court did not screen it to go forward until March 3, 2022.  On November 4, 2019, while this case was awaiting screening, Boyd entered into a settlement agreement with "the State of Wisconsin, the Wisconsin Department of Corrections ('DOC'), and all employees of those entities (collectively, 'State')."  (Ex. A (dkt. #33-1) 1.)  In exchange for monetary consideration, Boyd agreed to dismiss two pending lawsuits against the State with prejudice.  (*Id.* at 2.) Boyd also agreed to:

> [R]elease[] and forever discharge[] . . . the State, the DOC, and their officers, agents, employees, successors, personal representatives, and insurers (the 'Released Parties') from any and all manner of action or actions (including cause or causes of action, suits, debts, covenants, agreements, liabilities, rights, damages, costs, claims of interest, awards of attorney fees, claims and demands of any kind and nature whatsoever, in law or equity, whether based on State or Federal law) that release to any action or inaction – of any State of Wisconsin or DOC employee – that took place on any date before this Agreement is fully executed.

(*Id.* at 1-2.)  Boyd further agreed "not to file any new lawsuits, claims, or complaints in any court" "if such claims relate to any action or inaction – of any State of Wisconsin or DOC employee – that took place on any date before" the settlement agreement was executed. (*Id.* at 2.)  At that time, Boyd had three open cases in this court, this case and Case Nos. 17-cv-944 and 18-cv-530.

2

Before signing the November 4 settlement agreement, Boyd had also sent many letters to the Wisconsin Department of Justice attorneys, about his desire to settle his cases.  In particular, on September 6, 2018, the DOJ received a letter from Boyd in which he stated that he was open to resolving the '944 and '530 cases by settlement.  (Ex. 103 (dkt. #52-3) 1.)  On September 26, the DOJ received a settlement proposal from Boyd in which he clarified that the settlement would include all defendants, including two who the DOJ was not representing, Linda Corbett and Sandra McArdle.  Boyd requested $15,000.  The DOJ received a third letter from Boyd on January 2, 2029, in which Boyd referenced all three cases (including this case), asked the State to make an offer and suggested that the cases could be resolved for a modest amount.  (*Id.* at 7.)  The DOJ further received other letters from Boyd on February 25 and June 3, specifically asking to settle the '530 case.  On October 16, Boyd again sent two Assistant Attorneys General a letter about the '530 case, stating that he would settle that case for $5,000, in addition to having a legal loan debt cleared.  Boyd also alluded to a conversation he reportedly had with a DOJ attorney who offered to settle for $5,000.

One of these AAGs then started negotiating with Boyd.  At some point, however, Attorney Kyle Borkenhagen called the AAG and reported that he would be representing Boyd for negotiation purposes, although the AAG's impression was that Boyd retained Borkenhagen just to receive any settlement funds on his behalf, ostensibly to avoid certain deductions.  Regardless, Borkenhagen spoke over the phone with the AAG and Boyd numerous times, negotiating the final settlement amount.  In particular, on October 8, Borkenhagen called the AAG to offer $12,500 as a settlement figure, to which the AAG

3

countered with $4,000.  Eventually, however, the parties agreed to a $7,500 payment, as well as forgiveness of Boyd's legal loan debt to date.

Consistent with their agreement, the AAG sent a draft Mutual Release and Settlement Agreement to Borkenhagen on October 18.  Attorney Borkenhagen also believes that he had a call with Boyd about the release.  Although he does not recall the specifics of that conversation, Borkenhagen maintains that he would have gone through the release line by line and explained the agreement to the best of his ability.  Borkenhagen does recall talking to Boyd about carving out one defendant from the release, explaining to Boyd that there is a general release, meaning that "if you're trying to maintain a suit against somebody else, it's going to get released if we don't carve that out."  (Borkenhagen Dep. (dkt. #49) 14.)

During an October 24 call between Borkenhagen and Boyd, however, Borkenhagen also told Boyd that he was no longer willing to represent him and would inform the AAG of his withdrawal.  According to Boyd, Borkenhagen was frustrated by his separately reaching out to the DOJ and offering to settle two cases for $5,000, which prompted the AAG to take the $7,500 offer off the table.  Boyd claims to have assured Borkenhagen that he had a *new* claim related to the use of his CPAP machine, which meant that he did not need to hold out for the $7,500 settlement, to which Borkenhagen apparently responded that if Boyd signed the release, "there is a clause that would prevent you from pursuing that claim." (Boyd Decl. (dkt. #62) ¶¶ 19-20.)

Boyd says that he next spoke with the AAG over the phone about a settlement, during which they renegotiated the settlement terms, including that Boyd wanted to settle

*only* the '944 and '530 cases and would *not* agree to a general release clause.  According to Boyd, the AAG responded verbatim:  "In the final draft we'll remove that clause and add language which makes it clear that our agreement in this settlement only encompass the dismissal of the State Defendants in the 530 and 944 cases."  (*Id.* ¶ 29.)  Sometime after that claimed conversation, the AAG appears to have looped Borkenhagen back into negotiations, but it is unclear whether Borkenhagen and the AAG agreed to change the agreement related to the general release.  Regardless, the record indicates that the general release remained in the draft.

On November 1, 2019, Borkenhagen emailed the AAG a redlined version of the release, explaining that he made two changes to it.  Borkenhagen further authorized the DOJ to send the revised release to Boyd after asking the AAG to read the entire email to Boyd.  The AAG responded to Borkenhagen's email on November 4 that he would make the changes but was not comfortable advising Boyd.  Instead, the AAG offered to provide Boyd with a letter from Borkenhagen.  Borkenhagen responded that he had a call scheduled with Boyd for the next morning and asked the AAG to send him the settlement agreement before that call.  The AAG agreed, at which point, Borkenhagen again authorized the AAG to give the settlement agreement to Boyd for review.

Twenty minutes later the AAG emailed the revised Mutual Release and Settlement Agreement and Stipulation of Dismissal to the prison to deliver to Boyd.  Boyd claims he signed the revised agreement without reading it or talking to Borkenhagen because he felt rushed.  On November 5, Borkenhagen wrote to the AAG that he had spoken with Boyd that morning, and that Boyd had signed the mutual release the day before.  Apparently

during that conversation, Borkenhagen states that he explained to Boyd that dropping Corbett from the case would impact his ability to proceed with the '944 case, and Boyd was willing to take that risk.

Regardless, Boyd attests that he did not intend to settle *this* case.  Consistent with the policy of the DOJ's Civil Litigation Unit, the AAG attests in contrast that the global release clause is a standard clause he frequently includes in negotiating settlements to resolve all outstanding claims against any state entity as of the date of the agreement.

## OPINION

## I.    Motion for Partial Summary Judgement for Failure to Exhaust

Prisoners may not bring a federal claim about events in prison "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  In other words, a prisoner must follow all the prison's rules for completing the grievance process. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  This includes:  (1) compliance with instructions for filing an initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005); and (2) pursing all available appeals "in the place, and at the time, the prison administrative rules require," *Pozo*, 286 F.3d at 1025; *see also Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005).  "Exhaustion is necessary even if . . . the prisoner believes that exhaustion is futile." *Dole v. Chandler*, 438 F.3d 804, 808-09 (7th Cir. 2006); *see also Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005) ("An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement.") (citations omitted).

6

This exhaustion requirement affords prison administrators a fair opportunity to resolve a grievance without litigation.  *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006).  Still, because a prisoner's failure to exhaust constitutes an affirmative defense, defendant must prove it.  *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).  Thus, at summary judgment, defendants must specifically show that: (1) there is no genuine dispute of material fact as to plaintiff's failure to exhaust; and (2) they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In Wisconsin, prisoners must begin the exhaustion process by filing a grievance with an institution complaint examiner ("ICE") within 14 days after the incident giving rise to the grievance.  Wis. Admin. Code DOC § 310.07(2).  Among other requirements, a grievance must contain only one, clearly identified issue, as well as sufficient information for the Department of Corrections to investigate and decide the complaint.  § 310.07(5)-(6).  While the ICE may reject a grievance for specified reasons, § 310.10(6), the prisoner may still appeal the rejection to the appropriate reviewing authority within 10 days under § 310.10(10).  If the ICE accepts the grievance, then a recommendation is made to the reviewing authority, who renders a decision.  *Id.* §§ 310.10(12), 310.11.  If the ICE's recommendation is unfavorable, then the prisoner may appeal to the corrections complaint examiner ("CCE") within 14 days of the decision, unless good cause is shown for an untimely appeal.  *Id.* § 310.12(1), (6).  Finally, the CCE makes a recommendation to the DOC Secretary, who will take final action on the prisoner's grievance.  *Id.* § 310.13.

Boyd concedes that he did not follow these procedures with respect to his First Amendment retaliation claims against defendants Waterman and Lathrop.  Plus, none of

7

his inmate complaints use language suggesting that he believed he was being retaliated against for engaging in protected conduct, which is necessary to notify prison officials of a retaliation claim. *See Lockett v. Goff*, No. 17-cv-93-JDP, 2017 WL 4083594, at *2 (W.D. Wis. Sept. 13, 2017) (minimal requirement to exhaust First Amendment retaliation claim is to identify "the protected conduct that provoked the retaliation and the retaliatory act"). Therefore, defendants are entitled to summary judgment as to Boyd's First Amendment retaliation claims against Waterman and Lathrop, and Waterman will be dismissed from this lawsuit.

As for Boyd's Eighth Amendment claim against Drone, the court granted Boyd leave to proceed based on the allegations that on July 2, 2018, Drone required Boyd to walk to the HSU to receive his Tramadol despite having to endure severe pain to walk there. (Dkt. #9, at 8-9.) Boyd filed an inmate complaint two days *before* this interaction, claiming in WSPF-2018-14047 that he had been prescribed Tramadol for his lower back and neck pain, but on June 28, 2018, he was in too much pain to walk to the Health Services Unit ("HSU") to receive that medication. Boyd also alleged that he told defendants Kussmaul, Lathrop and Bromeland that he was in too much pain to walk, but they ignored his predicament, and further he then went without his pain medication for three and a half hours. On July 12, the ICE recommended dismissal of WSPF-2018-14047, but the next day plaintiff submitted additional information about his complaint, affirmatively alleging that defendant Waterman left him in his cell to punish him. That additional submission was not accepted because the ICE had already recommended dismissal. The Reviewing

8

Authority accepted the ICE's recommendation and dismissed the complaint.  Although Boyd appealed, his appeal was also dismissed.

Boyd also alleged in a later inmate complaint -- WSPF-2018-14391 -- that defendant Drone caused him pain by requiring him to walk to the HSU to receive his pain medication and that Drone did so to retaliate against him for filing inmate complaints and lawsuits.  The ICE recommended dismissal of that complaint as well on July 9, 2018, and the Reviewing Authority dismissed WSPF-2018-14391 on July 10.  However, Boyd did not appeal that later dismissal.

Defendants seek summary judgment on plaintiff's claim against Drone because at the time he filed WSPF-2018-14047, Drone had not yet required Boyd to walk to the HSU, and because Boyd did not appeal the dismissal of WSPF-2018-14391.  In opposition, Boyd concedes his failure to appeal WSPF-2018-14391, but he argues that WSPF-2018-14047 adequately notified prison officials of his claim against Drone.

Although Boyd did not need to specifically name Drone in the WSPF-2018-14047 inmate complaint to satisfy the exhaustion procedures, *see Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011), Boyd *did* need to provide enough information so that prison officials were in a position to investigate Boyd's allegation that Drone required him to walk to the HSU.  *See Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014) ("fatal defect" of grievance was "the absence of anything in it to indicate that [the defendant] was the target"); *see also Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002) (when procedures do not specify the level of detail required in grievance, inmate complaint is sufficient if it "alerts the prison to the nature of the wrong for which he was seeking redress").  In WSPF-2018-14047, Boyd

9

expressly limited his allegations to just events that took place on June 28, 2018, without alleging that the mistreatment was ongoing, nor that any HSU personnel were involved in the decision to require him to walk to get his medication.  Therefore, the ICE would not have reason to investigate events that occurred after June 28, nor actions taken by any HSU staff, much less Drone specifically.  For that reason, and because Boyd did not appeal WSPF-2018-14391, defendants are entitled to summary judgment on Boyd's claim against Drone.

Accordingly, the court will grant defendants' motion and dismiss the following claims without prejudice:  Boyd's Eighth Amendment deliberate indifference claim against defendant Drone, and Boyd's First Amendment retaliation claims against defendants Waterman and Lathrop.  *See Ford v.* Johnson, 362 F.3d 395, 401 (7th Cir. 2004) ("[A]ll dismissals under § 1997e(a) should be without prejudice").  Because there are no other federal claims proceeding against Drone in this lawsuit, and the federal claims that remain in this case do not involve Drone, the court will also relinquish its exercise of supplemental jurisdiction over Boyd's negligence claim against her as well.  *See Montano v. City of Chicago*, 375 F.3d 593, 602 (7th Cir. 2004) (courts consider the interest of fairness and judicial economy in considering whether to exercise supplemental jurisdiction over state-law claims).  Thus, defendants Waterman and Drone will be dismissed from this lawsuit.

II.     **Comprehensive Motion for Summary Judgment Based on 2019 Settlement Agreement**

Defendants seek dismissal of this entire case on the ground that Boyd released all his claims in executing the 2019 Settlement Agreement.  "Under Wisconsin law, when the

10

language of a settlement agreement is clear on its face, a court must assume that the language represents the parties' intent and must apply it as written." *Oliver v. Jess*, No. 20-C-1069, 2021 WL 2533508, at *2 (E.D. Wis. June 21, 2021).[2]

Here, defendants contend that they are entitled to summary judgment because the settlement agreement in which Boyd expressly released "any and all manner of action or actions (including . . . claims and demands of any kind and nature whatsoever, in law or equity…)" was executed on November 4, 2019, when Boyd was represented by counsel, and Boyd's claims in this lawsuit arose from events that occurred in June and July of 2018. Boyd does not dispute that the settlement agreement covers his claims in this lawsuit, but he opposes the motion because the settlement agreement did not explicitly mention this case; rather, it explicitly referenced the '944 and '530 cases. Boyd further contends that the AAG failed to exclude the global release from the settlement agreement consistent with their telephone conversation, and that this court should set aside that release. In support, Boyd directs this court to its decision in *Talley v. Hoffman*, No. 14-cv-783-jdp, 2022 WL 767048 (W.D. Wis. Mar. 14, 2022), in which the plaintiff had also entered into a settlement agreement with the State of Wisconsin and the DOC.

During negotiations in *Talley*, opposing counsel offered the plaintiff a monetary settlement in exchange for the plaintiff dismissing his pending lawsuit. The plaintiff had never offered to include other cases in the settlement agreement. New defense counsel was assigned to the case before the settlement agreement was executed, and neither defense

---

[2] The court construes the settlement agreement under Wisconsin contract law. *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000).

counsel ever mentioned including another lawsuit in the settlement agreement.   In particular, the second lawyer attested that he had never spoken with the plaintiff directly about the terms of the settlement, although he acknowledged never indicating to the plaintiff that the release was narrower than it read.   In *Talley*, the court denied defendants' motion for summary judgment under Wisconsin contract-law principles of fraudulent misrepresentation, mutual mistake and unilateral mistake.   *Id.* at *3-*5.   In particular, the court concluded that there were genuine disputes of fact as to whether the release clause could be enforced under Wisconsin law because (1) defense counsel did not attest that they intended to include the unlisted lawsuit in the settlement agreement, and (2) the plaintiff contended that he would not have settled the case had the unlisted lawsuit been included in the release.   The court further explained that to prove a misrepresentation theory under Wisconsin law, the plaintiff must show that he justifiably relied on counsel's failure to explicitly state that the settlement agreement included a release that would cover the second case.   *Id.* at *3 (citing *Hennig v. Ahearn*, 230 Wis. 2d 149, 165, 601 N.W.2d 14, 22 (Ct. App. 1999)).

The same principles apply here.   Of course, Boyd should have read every line of the settlement agreement before he signed it on November 4.   Yet a party's failure to read all the terms of a contract is only one factor in considering the totality of the circumstances surrounding the transaction.   *Hennig,* 601 N.W.2d at 23.   If Boyd did in fact have such an explicit exchange with the AAG about omitting the global release language from the settlement agreement, Boyd could have reasonably relied on the AAG to exclude the global release language.   For that same reason, the release may be invalid under Wisconsin law

12

because it was entered into by virtue of a mutual mistake or a unilateral mistake "coupled with fraud or inequitable conduct." *Id.* at 26.

Defendants' remaining arguments fail on this record. They contend that any disputes of fact related to what the AAG said during negotiations are immaterial because Attorney Borkenhagen represented Boyd during the final days of the negotiations and on November 1. But the nature of Borkenhagen's representation between October 24 and November 4 is also in dispute. According to Boyd, Attorney Borkenhagen no longer represented him for negotiation purposes starting October 24, and Borkenhagen agreed that his role after that point would be limited to using his firm's trust account. (Boyd Decl. (dkt. #62) ¶¶ 18, 20.) Boyd further attests that the AAG reached out to him directly, acknowledged that Borkenhagen was no longer representing him, and then the two explicitly discussed the settlement amount, agreeing that they would use Borkenhagen's firm's trust account to deposit the funds and remove the global release language from the final agreement. (*Id.* ¶¶ 24-29.) Defendants' appear to concede this ambiguity. They submit that Borkenhagen had at least attempted to foist off on the AAG the responsibility of reading the final terms of the agreement to Boyd, and the AAG does not directly dispute that he had additional conversations with Boyd after October 24 about the terms of the settlement agreement. In fact, his own case file shows that he had a phone call scheduled with Boyd on October 28, 2019. (*See* dkt. #64, ¶ 2.)

Still, defendants also contend that the record shows Boyd *did* discuss the terms of the settlement agreement with Attorney Borkenhagen about the consequences of signing the release, citing language from Attorney Borkenhagen's November 1 email to the AAG

as evidence.  In that email, however, Borkenhagen wrote that he authorized the AAG to send the revised release to Boyd with the Corbett carve-out, allowing the AAG to represent to Boyd that he approved the release language, with a warning that the carve-out might affect his ability to proceed in *that* case.  (*See* dkt. #53-1 at 9.)  Attorney Borkenhagen did not say that he spoke with Boyd that day, and Boyd denies that Borkenhagen walked through the language of the release with him.  (Boyd Decl. (dkt. #62) ¶ 37.)

Defendants have not directed the court to any other evidence of record indicating that Borkenhagen and Boyd had a conversation about the global release language *after* Boyd allegedly re-negotiated the terms of the settlement agreement with the AAG.  And Boyd attests that the only time that he spoke with Borkenhagen about a general release was the conversation that prompted Boyd to bring it up with the AAG in the first place.  (*See* Boyd Decl. (dkt. #62.) ¶ 38.)  In any event, what is relevant for purposes of summary judgment is whether Boyd reasonably misunderstood the terms of the settlement agreement based on the AAG's statements.  If Boyd did in fact agree with the AAG that the general release would be removed from the agreement, Boyd could have arguably relied on that representation, leaving the possibility that mutual or unilateral mistake may void the global release here.  Although the presence of a general release in the agreement he signed with *no* carve out for any earlier case, cause of action or claim would appear to undermine the reasonableness of that mistake, the express language listing only two causes to be dismissed would appear to support the reasonableness of plaintiff's confusion in this regard.

When there is an arguable dispute of material fact over the existence or terms of a settlement agreement, the district court should conduct an evidentiary hearing to resolve

14

the matter.  *See Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 449 (7th

Cir. 2004); *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995).  The court will direct the

clerk of court to schedule an evidentiary hearing to consider defendants' release affirmative

defense.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #32) is DENIED.

2) Plaintiff's motion to strike (dkt. #54) is DENIED.

3) Defendants' motion for partial summary judgment (dkt. #23) is GRANTED. Plaintiff's First Amendment claims against defendants Jolinda Waterman and Logen Lathrop and Eighth Amendment claim against defendant Ashley Drone are DISMISSED without prejudice.

4) The court relinquishes jurisdiction over plaintiff's negligence claim against Drone, which is DISMISSED without prejudice.

5) Defendants Waterman and DRONE are DISMISSED from this lawsuit.

6) The claims that remain in this case are:  Eighth Amendment claims against defendants Kussmaul, Lathrop, Mumm, Bromeland and Anderson.

7) The clerk of court is directed to set this case for a Zoom evidentiary hearing to resolve defendants' affirmative defense of release.

Entered this 11th day of July, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge